IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Douglas Willard,

      Plaintiff,

      v.                        Case No. 2:12-cv-266

The Ohio Operating Engineers
Pension Plan, et al.,

      Defendants.

OPINION AND ORDER

    This is an action brought pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001, et seq.  In Count I of his complaint, Douglas Willard, a participant in the Ohio Operating Engineers Pension Plan ("the Plan"), asserts a claim for benefits pursuant to 29 U.S.C. §1132(a)(1)(B) against the Plan and its Board of Trustees ("the trustees").[1]  This matter is now before the court on the parties' cross-motions for judgment on the administrative record.

I. Standard of Review

A. Applicability of Arbitrary and Capricious Standard of Review

    A plan administrator's denial of benefits is reviewed de novo unless the benefit plan specifically gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan.  Morrison v. Marsh & McLennan Companies, Inc., 439 F.3d 295, 300 (6th Cir. 2006).  Where an ERISA plan gives the plan administrator such discretionary authority, the

---

[1] By order dated January 30, 2013, the benefits claim brought against the Ohio Operating Engineers Health and Welfare Plan and its Board of Trustees was dismissed without prejudice for failure to exhaust administrative remedies.  That order also dismissed Count II, plaintiff's claim for breach of fiduciary duty.

administrator's decision is reviewed under the arbitrary and capricious standard.  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 111 (1989).  The Plan provides for a board of trustees consisting of eight persons.  Half of the trustees are union trustees, and half of the trustees are employer trustees.  AR 175, Plan, §8.01.  The Plan is administered by a fund administrator appointed by the trustees.  AR 175, Plan, §9.01.  The Plan provides that the "Trustees or the Fund Administrator, if so directed by the Trustees, shall have such powers as may be necessary to discharge their duties to administer the Plan in their sole and absolute discretion."  AR 175, Plan, §9.02.  Those powers include the authority "to construe and interpret the Plan, decide all questions of eligibility and determine the amounts, manner and time of payment of any benefits hereunder[.]" AR 176, Plan, §9.02(a).  The Plan also includes a procedure for review by the trustees of the denial of a claim for benefits by the fund administrator.  AR 182, Plan §14.03.  This provision specifies that the "Trustees will make a determination, in their sole discretion, based upon the applicable provisions of the Plan, whether to approve or deny such appeal." AR 183, Plan §14.03.  The court concludes that the Plan gives the trustees discretionary authority, and that the arbitrary and capricious standard of review applies in this case.

B. Conflict of Interest

Plaintiff contends that any financial conflict of interest on the part of the fund administrator should be considered in reviewing the decision to deny benefits.  In applying the arbitrary and capricious standard, a court will weigh as a factor whether a conflict of interest existed on the part of the decision-maker in

2

determining whether there was an abuse of discretion. <u>Metropolitan Life Ins. Co. v. Glenn</u>, 554 U.S. 105, 115 (2008); <u>Bennett v. Kemper Nat'l Servs., Inc.</u>, 514 F.3d 547, 552-53 (6th Cir. 2008).  However, "[m]ere allegations of the existence of a structural conflict of interest are not enough to show that the denial of a claim was arbitrary; there must be some evidence that the alleged conflict of interest affected the plan administrator's decision to deny benefits." <u>Peruzzi v. Summa Medical Plan</u>, 137 F.3d 431, 433 (6th Cir. 1998).

In this case, the Plan is a multi-employer plan which is funded by employer contributions, and all contributions and Plan assets are held in trust. <u>See</u> AR 220.  No evidence has been presented indicating that the fund administrator or the trustees derive any financial gain from denying benefit claims.  The Sixth Circuit has held that where the plan is a multi-employer plan without a profit motive and the individual trustees receive no personal financial benefit from approving or denying claims, this structure does not create an inherent conflict of interest. <u>See Klein v. Central States, Southeast and Southwest Areas Health and Welfare Plan</u>, 346 F.App'x 1, 5 (6th Cir. 2009); <u>see also Love v. Central States, Southeast and Southwest Areas Pension Plan</u>, No. 1:11-cv-275 (unreported), 2012 WL 394992 at *8 (S.D.Ohio Feb. 7, 2012); <u>Muse v. Central States, Southeast and Southwest Areas Health and Welfare and Pension Funds</u>, 227 F.Supp.2d 873, 877 (S.D.Ohio 2002).  The mere possibility that the trustees may have considered the financial ramifications to the Plan assets in making their decision does not create a conflict of interest. <u>Muse</u>, 227 F.Supp.2d at 877.  Furthermore, the fact that the Board of Trustees

3

is made up of both employer and union representatives in equal numbers also distinguishes this case from the potential for bias found where a single employer administers a self-funded plan. See id.; Klein, 346 F.App'x at 5. The court concludes that there is no evidence in this case suggesting that the fund administrator or the trustees acted under a conflict of interest.

II. The Administrative Record

In 2006, plaintiff began receiving an early unreduced retirement pension benefit based on disability after he was diagnosed with lymphoma in 2005. By letter dated March 18, 2011, Ray Orrand, the Plan administrator, advised plaintiff that "it has been brought to our attention that you may be working full time as an operating engineer while receiving benefits from Local 18." Orrand asked plaintiff to submit his 2010 tax return "[i]n order to verify that you are not working in excess of 40 hours per month while receiving pension benefits[.]" Doc. 26-1, p. 1. Plaintiff submitted his 2010 federal and Ohio tax returns and W-2 forms. Doc. 26-1, pp. 3-14. On his individual tax return, plaintiff claimed $761 in business income, and identified his occupation as "DRIVER." Doc. 26-1, pp. 4-5. On the schedule for profit or loss from business, he specified that his principal business was "FARM HAND" and claimed expenses in the amount of $1,411 for gravel and limestone. Doc. 26-1, pp. 6-7.

By letter dated April 18, 2011, Orrand informed plaintiff that after "reviewing your job classifications on the [tax returns] submitted, farm hand and driver, it is my decision that you are no longer qualified to receive disability pension benefits" and that plaintiff's benefits would "cease effective May 1, 2011." Doc. 26-

4

1, p. 15.   In a letter dated May 12, 2011, to Orrand, plaintiff's
counsel referenced the April 18, 2011, letter "terminating
[plaintiff's] pension benefits" and stated that plaintiff was
appealing the denial of benefits under the Plan.   AR 38.   Counsel
further stated that in 2010, plaintiff "was self employed as a
driver/farm hand.   His duties in these positions consisted of
driving a trailer with hay and driving a dump truck with gravel."
However, counsel claimed that plaintiff "has never operated any
machinery even remotely similar to the work [he] performed as an
operating engineer."   AR 39.   By letter dated June 2, 2011, counsel
asked Orrand whether plaintiff's benefits had been restored, as he
had received a benefits payment for June of 2011.   Doc. 26-1, p.
16.   By letter dated June 8, 2011, Orrand informed counsel that
plaintiff had not appealed the suspension of his benefits, and that
the June payment was made in error and should be returned.   Doc.
26-1, p. 18.   Counsel responded to Orrand by letter dated June 14,
2011, and stated that plaintiff had appealed the denial of his
benefits, referencing counsel's letter of May 12, 2011, and that
plaintiff "requests a review that the suspension/termination of his
benefits be repealed[.]"   Doc. 26-1, p. 19.   However, before any
appeal was submitted to the trustees, Orrand notified counsel by
letter dated June 24, 2011, that "[b]ased on current language
contained in the Ohio Operating Engineers Pension Fund, Mr.
Willard's pension benefits have been reinstated at this time."
Doc. 26-1, p. 27.

On July 20, 2011, plaintiff was examined by Dr. Robert F.
Shadel, M.D., pursuant to the terms of the Ohio Operating Engineers
Health and Welfare Plan, from which plaintiff was also receiving

benefits. In his report dated July 21, 2011, Dr. Shadel noted that plaintiff "did not work as a crane operator after 2005 but worked as an operating engineer." AR 33. Dr. Shadel further wrote that plaintiff stated that "there was some upset with him working as an operating engineer and he believes that is why he has been sent in for this examination today." AR 33.

By letter dated August 15, 2011, Orrand advised plaintiff that his disability retirement benefit under the Plan was "suspended as of September 1, 2011 ... pursuant to Article 6, Section 6.06 of the Plan." AR 5. The letter further stated:

> Under Section 6.06(f) of the Plan, a Participant receiving benefits must "... notify the Fund Administrator of certain details of any employment after such benefits have commenced." In the event the Participant fails to provide the required notice, Section 6.06(f) states that the Fund Administrator shall suspend pension benefits upon learning of subsequent potential service of 41 Hours of Service or more for an employer within the jurisdiction of the Union.
>
> It has come to the Plan's attention based on statements you made during a recent examination of your disability status that you have worked as an operating engineer after 2005. The Plan has also received documents indicating that you have worked as a dump truck driver hauling gravel in 2010 and that you have a current commercial driver['s] license. Considering this information as a whole, it appears that you are in violation of the Plan's suspension of benefits provision and therefore, pursuant to Section 6.06(f) of the Plan, your benefits are suspended as of September 1, 2011.

AR 5. The letter went on to advise plaintiff of his right to appeal the adverse decision to the trustees. AR 5-7. The administrative record includes an abstract driver record indicating that plaintiff had a Class A commercial driver's license issued on April 1, 2011, with endorsements for "MOTORCYCLE, TANK VHCL,

DBL/TRP/TL" (AR 8); photographs of plaintiff operating a backhoe[2] in Fairfield County on March 31, 2011, and of plaintiff's residence taken in mid-March of 2011, showing a dump truck and a pile of gravel in the yard (AR 10-19); and Dr. Shadel's report (AR 33-35).

By letter dated October 14, 2011, plaintiff's counsel informed Orrand that plaintiff was appealing the Plan's decision suspending benefits.  Plaintiff submitted tax returns and W-2 forms for the years 2004 through 2010, which reflected income from Kokosing Construction from 2004 to 2006, and income from C & L Erectors and Riggers in the amount of: $18,171.20 in 2007; $4,157.73 in 2008; and $1,170.00 in 2009.  AR 40-58.  By letter dated November 11, 2011, plaintiff's counsel was advised that plaintiff's appeal was scheduled to be heard at the trustees' meeting on January 30, 2012. This letter further stated that plaintiff and counsel could present plaintiff's opinion at the meeting and submit a position statement along with authorities or additional evidence.  AR 61.

Plaintiff's counsel informed Thomas Tarpy, counsel for the Plan, by letter in January of 2012 that he and plaintiff would not be attending the trustees' meeting.  AR 91.  In this letter, counsel stated that plaintiff denied working as an operating engineer after 2005, and argued that plaintiff was still disabled. AR 92-94.  Counsel also submitted several medical records, including: a December 22, 2009, report from Dr. Robert Mueller concerning surgery on plaintiff's right arm (Ex. A); August 9, 2011, and August 23, 2011, reports from Dr. Brian Jenkins, who

---

[2] This equipment, also referred to in the record as a front loader, consisted of a large treaded vehicle with a box-like, windowed structure surrounding the driver's seat and the controls, a long, jointed arm, and a movable bucket scoop attached to the end of the arm.  AR 18.

treated plaintiff for low back pain (Exs. B and D); a July 21, 2011, radiology report from Dr. John Leach, diagnosing plaintiff as having lumbar spine degenerative disc disease (Ex. C); an August 11, 2011, report from Dr. James Sardo concerning plaintiff's back pain (Ex. E); a letter dated August 29, 2011 from Dr. Jeanna Knoble expressing concern about plaintiff returning to work in light of his lymphoma (Ex. F); a September 5, 2008 report from Dr. Praveen Giri, who saw plaintiff for numbness and tingling in his hands (Ex. H); a note from Dr. James Mosley stating that plaintiff has persistent dizziness and problems with equilibrium (Ex. G) and Dr. Mosley's September 26, 2011, report regarding his treatment of plaintiff for back pain (Ex. I).  AR 96-114.  Dr. Mosley noted in an addendum to his September report that plaintiff had called to state that there were some inaccuracies in the past medical history and social history portion of the treatment notes for September 22, 2011, which contained information taken from the medical records of Dr. Jenkins, plaintiff's primary physician.  AR 113-114.  The "Social History" section of Dr. Mosley's notes originally stated that plaintiff was a "former crane operator for Kokosing; self employed part-time dump truck operator."  AR 110.  The notes were amended to state that plaintiff was a "former crane operator and truck operator for Kokosing, now disabled."  AR 114.

The administrative record also includes a WebTAP investigative report from Joshua Nehis, an investigator with InfoQuest Investigative Services, concerning a background investigation conducted on plaintiff on November 28, 2011.  The report indicated that plaintiff stated on his Facebook profile that he works for Willard Gravel.  The phone number provided for the business was the

same number registered to plaintiff's home address and the same number provided by plaintiff on his 2010 tax return. AR 68, 234. The report also stated that the number for Willard Gravel was found in various online phone books, the 2010 Hocking Valley Advertiser, and the 2011 Ross County Advertiser. AR 69-70. The record includes copies of advertisements for Willard Gravel contained in the April 4, 2010, Hocking Valley Advertiser and the February 13, 2011, Pickaway County Advertiser. AR 117, 128. The InfoQuest report also included a traffic crash witness statement prepared by Trooper Ward of the Ohio State Highway Patrol following plaintiff's motorcycle accident on July 12, 2011, in which plaintiff stated that at the time of the accident, he had just looked at a driveway estimate job. AR 78.

The record contains a report from InfoQuest dated December 23, 2011, regarding the surveillance of plaintiff's residence. The report stated that plaintiff has a dump truck registered in his name. AR 62. On December 12, 2011, a dump truck arrived at plaintiff's residence and dumped a load of gravel near the pole barn. Plaintiff's registered dump truck arrived around 1:45 p.m., but it was not clear who was driving the truck. AR 63. On December 14, 2011, the investigator observed plaintiff's dump truck parked in the driveway with a trailer attached containing a skid steer, and he also observed a backhoe near the pole barn. Plaintiff left his residence driving the dump truck at 8:28 a.m. and was followed to Melvin Stone, a limestone company in Chillicothe, where he obtained a load of stone. Plaintiff returned to his residence and dumped the load of stone. Plaintiff then returned to Chillicothe and went to Melvin Stone for another load

of gravel.  Plaintiff proceeded to a residence on State Route 56, where he dumped the gravel in the driveway.  He got out of the truck and raked the driveway before leaving.  Plaintiff then drove back to his residence.  AR 63-66.  A copy of the video taken on December 14, 2011, is included in the record.  See Doc. 18.

In an e-mail dated January 26, 2012, InfoQuest investigator Michael Doody reported that he spoke that day with Moni, a scale clerk at Melvin Stone, concerning plaintiff.  AR 139.  An audio recording of this phone interview is included in the record.  See Doc. 18.  Doody referred to plaintiff by name, stating that he was considering hiring him for a job.  Moni stated that plaintiff pulls up at least weekly, and sometimes daily during the busy summer months, to get loads of gravel, paying with a credit card account he has with Melvin Stone.  She stated that she only observes plaintiff on the video screen, and she could not describe him other than to say that he has dark hair and drives a dump truck.  AR 139.

The record also includes an audio recording of a conversation on January 27, 2012, between the InfoQuest investigator and Dr. Douglas Paul, whose residence plaintiff visited on December 14, 2011, during the video surveillance.  See Doc. 18.  Dr. Paul stated that he had hired plaintiff a couple months ago to apply gravel, move earth and fix a culvert on his property.  He described plaintiff as a hands-on owner, and stated that plaintiff worked four full days on the job.  Dr. Paul stated that he learned about plaintiff from a flyer he saw in Laurelville, and reported that plaintiff does most of the earth-moving, gravel and trench work for the Village of Adelphi in Ross County.

On February 3, 2012, following the trustees' meeting on

10

January 30, 2012, Plan Administrator Orrand, on behalf of the trustees, notified plaintiff that the trustees had decided to uphold the suspension of his pension benefits. Orrand referred to Plan §6.06(a), which provides that "[a]ny monthly benefit otherwise payable under this Plan shall be permanently forfeited for any month in which a Participant or former Participant is credited with 41 or more hours of service in that month in the geographic jurisdiction of the Union in a trade or craft in which the Participant was employed while a Participant in the Plan." Orrand also quoted from Plan §6.06(f), which provides:

> Participants receiving benefits must notify the Fund Administrator of certain details of any employment after such benefits have commenced. Such details shall include the name and address of the employer, work site location, date employment commenced, nature of employment, actual hours worked by month and expected monthly hours. If the Participant does not provide such notice, the Fund Administrator shall suspend pension benefits pursuant to this section upon learning of subsequent potential service of 41 Hours of Service or more for an employer within the jurisdiction of the Union unless it is unreasonable under the circumstances for the Fund Administrator to presume that the Participant was engaged in such service.

AR 170.

Orrand further stated that plaintiff's benefits were suspended in August, 2011, based on evidence indicating that plaintiff was "actively working in the trade," including: statements allegedly made by plaintiff during the July 21, 2001, physical examination; plaintiff's 2010 tax return, which listed plaintiff's occupation as a "driver;" plaintiff's current commercial driver's license; and photographs of plaintiff operating a front loader. AR 143. The letter then discussed additional evidence obtained while the appeal

11

was pending "confirming that you are actively working in Local 18's jurisdiction as an operating engineer," including: the December, 2011, video which showed plaintiff picking up, hauling and delivering gravel to a residence and resurfacing the driveway; advertisements from 2010 and 2011 for Willard Gravel offering driveway, bank run, top soil, fill material and mobile home transport and set-up services; the fact that the number given for Willard Gravel was the number included by plaintiff on his 2010 tax return; and plaintiff's statements to the accident investigator on July 12, 2011, that he was on his way back from a driveway estimate job prior to the accident. AR 144. Orrand concluded, "All of this evidence supports the Plan's presumption that you are working more than 41 hours a month as an operating engineer." AR 144.

Orrand noted the arguments made in plaintiff's position paper, including plaintiff's allegations that Dr. Shadel's notation that he was working as an operating engineer was a fabrication, and that the Plan was previously aware that he had a commercial driver's license and that he did "driving work." He also noted plaintiff's denial that he had worked as an operating engineer since 2005. AR 144. Orrand referred to the medical reports submitted by plaintiff, including the opinion of Dr. Jenkins that he could not see how plaintiff could be expected to operate heavy machinery again. Orrand then stated, "The issue before the Board, however, was not whether you are still disabled, but rather whether it was reasonable for the Plan to presume you were working more than 41 hours a month as an operating engineer." AR 114.

Orrand goes on to state that the Board agreed with the Plan's decision to suspend plaintiff's benefits based on: 1) plaintiff's

12

statements to Dr. Shadel; 2) photos of plaintiff operating heavy equipment; 3) the 2010 tax return listing plaintiff's occupation as "driver;" 4) plaintiff's commercial driver's license; and 5) W-2 forms from 2007-2009 showing that plaintiff received income from C&L Erectors & Riggers, a business located in Laurelville, Ohio. Orrand then observed:

> You provided no evidence to the Board indicating that you are not working in the trade other than stating in your appeal letter that you had not worked as an operating engineer since 2005 and submitting medical reports to support your claim that you cannot operate heavy equipment. Your claims are contrary to the pictures and video that exist of you operating heavy equipment including a dump truck. You operate a business called Willard Gravel and actively advertised that business in 2010 and 2011. All of this evidence supports the credibility of Dr. Shadel's July 21, 2011 report notation that, while you may not have worked as a crane operator after 2005, you have worked as an operating engineer. Also, the use of the phrase "operating engineer" is not isolated in Dr. Shadel's report, as he also wrote that you said that people were "... upset with him working as an operating engineer and the believes that is why he has been sent in for this examination today."

AR 144-145. Orrand then noted the "[p]articularly troubling" notation in Dr. Mosley's September 26, 2011, report that plaintiff called his office to say that the statement that plaintiff was a self-employed part-time dump truck operator was inaccurate, after which Dr. Mosley revised his report to state that plaintiff was a former crane operator and truck operator for Kokosing, now disabled. Orrand commented, "Your action in having this report revised indicates an attempt on your part to misrepresent your current employment status to both your physicians and to the Plan." AR 145.

13

III. Review of the Trustees' Decision

A. Compliance with Review Procedures

1. Notification Letter

Plaintiff argues that the Plan's decision suspending his benefits did not comply with ERISA's notice requirements.  Under 29 U.S.C. §1133, an employee benefit plan must:

> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

> (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. §1133.  Similarly, the Department of Labor regulations require that a notification letter contains: (1) the specific reason(s) for the adverse determination; (2) reference to the specific plan provisions on which the determination is based; (3) a description of any additional materials necessary to perfect a claim; and (4) a description of the plan's review procedures, the time limits applicable to such procedures, and the claimant's right to bring a civil action following an adverse benefit determination or review.  29 C.F.R. §2560.503-1(g).

The essential purposes of the statute are: (1) to notify the claimant of the specific reasons for a claim denial; and (2) to provide the claimant an opportunity to have that decision reviewed by the fiduciary.  Wenner v. Sun Life Assurance Co. of Canada, 482 F.3d 878, 882 (6th Cir. 2007).  The Sixth Circuit applies a "substantial compliance" test to determine whether §1133's notice requirements have been met.  Id.  The relevant inquiry is "whether

14

the plan administrators fulfilled the essential purpose of [§1133]—
notifying Plaintiff of their reasons for denying his claims and
affording him a fair opportunity for review." Moore v. Lafayette
Life Ins. Co., 458 F.3d 416, 436 (6th Cir. 2006).  In deciding
whether there has been substantial compliance, courts consider all
communications between an administrator and plan participant to
determine whether the information provided was sufficient under the
circumstances.  Id.  "When claim communications as a whole are
sufficient to fulfill the purposes of Section 1133 the claim
decision will be upheld even if a particular communication does not
meet those requirements." Kent v. United Omaha Life Ins. Co., 96
F.3d 803, 807 (6th Cir. 1996).

The August 15, 2011, notification letter complied with the
requirements of §1133.  The letter noted the specific Plan
provision, §6.06(f), which was relied upon as the basis for the
suspension of benefits, and quoted the relevant language from that
provision.  The letter explained the evidence relied upon by the
Plan in concluding that plaintiff was in violation of that section
of the Plan.  The letter also advised plaintiff of his right to
appeal the decision, specified the time limits for filing an
appeal, and advised him of his right to present additional
evidence.  AR 5.  Plaintiff was advised that the appeal would be
heard at the next quarterly meeting of the trustees, and that he
had a right to bring a civil action following the completion of the
appeals process.  AR 6.  Attached to the letter is a copy of the
Plan's appellate procedure.  AR 7.  The October 14, 2011, letter of
plaintiff's counsel to Orrand also indicates that plaintiff
understood the reason for the suspension of his benefits.  See AR

15

38 ("You provided the reason for suspending benefits because Mr. Willard has allegedly 'worked as an operating engineer after 2005' coupled with the fact that Mr. Willard hauled gravel for a short time in 2010 and has a CDL; thereby violating Section 6.06(f) of the Plan."). The purposes of §1133 have been satisfied in this case.

## 2. New Evidence Considered by Trustees

Plaintiff also argues that he was not afforded a fair review process because the trustees considered evidence which was submitted following the August 15, 2011, decision of the Plan denying benefits, including video showing plaintiff hauling gravel and resurfacing a driveway, audio of interviews with an employee at Melvin Stone and plaintiff's customer, Dr. Paul, and advertisements for plaintiff's gravel business.

In Metzger v. UNUM Life Ins. Co. of Am., 476 F.3d 1161, 1167 (10th Cir. 2007), the court held that a plan administrator was not required to furnish evidence generated during the administrative appeal process to the claimant prior to the final decision on appeal. See also Midgett v. Washington Group Int'l Long Term Disability Plan, 561 F.3d 887, 896 (8th Cir. 2009); Glazer v. Reliance Standard Life Ins. Co., 524 F.3d 1241, 1245-46 (11th Cir. 2008). In so holding, these courts relied on Department of Labor regulations. Section 2560.503-1(h) requires employee benefit plans to "establish and maintain a procedure by which a claimant shall have a reasonable opportunity to appeal an adverse benefit determination." 29 C.F.R. §2560.503-1(h). The "adverse benefit determination" referred to throughout that section "is the plan administrator's initial denial of a claim for benefits". Midgett,

16

561 F.3d at 894 (citing <u>Price v. Xerox Corp.</u>, 445 F.3d 1054, 1056 (8th Cir. 2006)).

Under 29 C.F.R. §2560.503-1(h)(2)(iii), an administrator on appeal is required to:

> Provide ... <u>upon request</u> and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits. Whether a document, record, or other information is <u>relevant</u> to a claim for benefits shall be determined by reference to paragraph (m)(8) of this section

29 C.F.R. §2560.503-1(h)(2)(iii)(emphasis supplied). Under paragraph (m)(8), a document, record or other information is considered "relevant" if it was "relied upon in making the benefit determination" or "submitted, considered, or generated in the course of making the benefit determination." 29 C.F.R. §2560.503-1(m)(8). The court in <u>Metzger</u> interpreted §2560.503-1(h)(2)(iii) as requiring that "relevant documents generated or relied upon during the initial claims determination must be disclosed prior to or at the outset of an administrative appeal." <u>Metzger</u>, 476 F.3d at 1167; <u>see also</u> <u>Midgett</u>, 561 F.3d at 894 (§2560.503-1(h)(2)(iii) entitles a claimant to review the administrative record of initial denial of her claim); <u>Glazer</u>, 524 F.3d at 1245 (noting that new document was not subject to disclosure under subsection (h)(2)(iii) as "relevant" under subsection (m)(8) until plan "relied upon" the new evidence in reaching a final decision on appeal).

A different regulation permits access to documents following a adverse benefit determination on review or appeal. Section 2560.503-2(i)(5) provides: "In the case of an adverse benefit determination <u>on review</u>, the plan administrator shall provide such access to, and copies of, documents, records, and other information

described in paragraphs (j)(3), (j)(4) and (j)(5) of this section as is appropriate." 29 U.S.C. §2560.503-2(i)(5)(emphasis supplied). "The inclusion of the language 'on review' [in §2560.503-1(i)(5)] differentiates the initial 'adverse benefit determination' from later internal appeals of it." Price, 445 F.3d at 1057. Thus, the Metzger court concluded that under §2560.503-2(i)(5), "relevant documents generated during the administrative appeal—along with the claimant's file from the initial determination—must be disclosed after a final decision on appeal." Metzger, 476 F.3d at 1167; see also Midgett, 561 F.3d at 895 (holding that "following a denial of a first-level or second-level appeal, §2560.503-1(i)(5) entitles a claimant to review the materials relevant to his or her claim on appeal" and that claimant was entitled to access new documents only after plan "made its 'adverse Benefit determination' on review"); Glazer, 524 F.3d at 1245 (after plan reached final decision, all relevant documents generated during review had to be produced under subsection (i)(5)).

The court in Metzger also noted that the Department of Labor's own description of these regulations supported the court's interpretations.. Id. at 1167; see also Midgett, 561 F.3d at 896; Glazer, 524 F.3d at 1246. In explaining its decision to adopt §2560.503-1(m)(8), the Department of Labor indicated that the purpose of the production of these documents was to "provid[e] claimants with adequate access to the information necessary to determine whether to pursue further appeal." ERISA Claims Procedure, 65 Fed.Reg. 70,246, 70,252 (Nov. 21, 2001). The Metzger court concluded that giving claimants pre-decision access to

18

documents generated during the administrative appeal would nullify the Department's explanation.  Metzger, 476 F.3d at 1167 (noting that access to documents during the course of an administrative appeal would not aid claimants in determining "whether to pursue further appeal" because they would not yet know if they faced an adverse decision); see also Midgett, 561 F.3d at 896; Glazer 524 F.3d at 1246.

A separate issue is presented by the claimant's duty under §2560.503-1(h)(2)(iii) to request documents.  In Balmert v. Reliance Standard Life Insurance Co., 601 F.3d 497 (6th Cir. 2010), the Sixth Circuit noted but did not decide the issue of the limits of a claimant's right to rebut evidence generated during the course of an administrative appeal.  However, the court did conclude that the plaintiff's failure to request documents precluded her from arguing that she was deprived of a full and fair administrative review.  Id. at 502 ("A claimant's failure to fully explore and exercise her procedural rights does not undermine the fundamental fairness of an otherwise full and fair administrative review process.").  The court further noted that even if the claimant had a right to receive a copy of a document generated during the course of the administrative appeal, "a proposition that is dubious in light of the holdings of two of our sister circuits" (citing Glazer and Metzger), "to exercise this purported right, Balmert was required to request a copy of the report." Id. at 502-03 (citing §2560.503-1(h)(2)(iii)).  Section 2560.503-1(h)(2)(iii), by its terms, imposes a duty of access "upon request[.]" See LeSuer v. HCA Inc., 398 F.App'x 177, 179 n. 2 (9th Cir. 2010)(finding no procedural violation where plaintiff did not contend that she ever

requested but was denied copies of reviews).

In the instant case, plaintiff was informed in the August 15, 2011, letter, that "upon request, the Plan will provide you, free of charge, with a copy of the documents, records, or other information that are relevant to your appeal." AR 6. No request by plaintiff for documents appears in the record. No request to inspect either the administrative record before the Plan administrator or new documents received by the trustees during the appeal was included in the appeal letter of October 14, 2011. See AR 36. Plaintiff was also invited to attend the trustees' meeting at which his appeal was heard, which would have provided plaintiff with another opportunity to ask to inspect the contents of the administrative record, but plaintiff elected not to attend the meeting. AR 61, 91. Even assuming that plaintiff had a right under §2560.503-1(h)(2)(iii) to inspect and copy evidence obtained by the Plan during the course of the appeal, he could have preserved those rights by including a request for copies of any documents generated during the course of the appeal in his appeal letter.

The court in Metzger did include a safety valve in its decision by noting that the applicable regulations were consistent with "full and fair review" so long as "appeal-level reports analyze evidence already known to the claimant and contain no new factual information or novel diagnoses[.]" Metzger, 476 F.3d at 1167. With this language, the court recognized that a case might arise where even compliance with the applicable regulations might not be sufficient to provide a claimant with a "full and fair review." However, the facts of this case do not warrant applying

such an exception.

The record fails to show that plaintiff was prejudiced by the trustees' consideration of the new evidence. That evidence was more of the same type of evidence already before the Plan administrator. The new evidence, such as the video of plaintiff picking up and delivering gravel and the advertisements for his business, concerned matters with which plaintiff had personal involvement and knowledge. Plaintiff does not deny that he drove a dump truck with gravel, as depicted in the video. In fact, plaintiff stated in his motion that the Plan had previously been given documents "on two occasions that Mr. Willard was employed as a driver/farm hand and even specifically stated he hauled gravel" and that plaintiff "does not deny" that he "hauls gravel in a dump truck from time to time." Doc. 30, pp. 11, 13; see also AR 252 (May 12, 2011, letter of counsel acknowledging that plaintiff was self-employed driving a dump truck with gravel). Plaintiff's counsel asserted in his letter of October 14, 2011, that the Plan was aware that plaintiff had a commercial driver's license. AR 36. Plaintiff had previously submitted his 2010 tax return to the Plan, which states that his occupation is "DRIVER" and included a schedule for business income concerning his business as a "FARM HAND." AR 235-236. The new evidence simply corroborates evidence, including plaintiff's tax returns and the admissions in counsel's letters establishing that plaintiff drove a dump truck hauling gravel, which was before the Plan at the time of the initial suspension of benefits.

In his motion, plaintiff does not contest the accuracy of the new evidence. Plaintiff does not contend that he would have

challenged the veracity of this evidence if given the opportunity during the appeals process.  In fact, the nature of the new evidence would have made it difficult to refute.  It includes video footage of plaintiff driving a dump truck, standing outside the truck at a gas station during the trip, dumping gravel on a driveway and raking it, then driving the truck into his own driveway; audio recordings of the investigator's conversations with Dr. Paul and a clerk at Melvin Stone; and newspaper advertisements for Willard Gravel bearing the same phone number shown on plaintiff's 2010 tax returns.[3]  Rather, plaintiff simply notes in passing that new evidence was considered, then argues that the new evidence was not relevant to the notification requirement found in §6.06(f).  See Doc. 30, p. 11.  Plaintiff's alleged compliance with the notice requirement is one of plaintiff's primary arguments in this case, which the court has addressed below, and the trustees' consideration of the new evidence in no way impedes plaintiff's ability to make that argument now.

The court concludes that the receipt by the trustees of new evidence during the appeals process did not deprive plaintiff of a full and fair review of his claim on appeal.

3. Alleged New Ground for Decision

A plan administrator "may not initially deny benefits for one reason, and then turn around and deny benefits for an entirely different reason, after an administrative appeal, without affording the claimant an opportunity to respond to the second, determinative

_____

[3] Plaintiff also refers to the  photographs of him operating a backhoe as constituting new evidence.  However, the placement of these photographs before Dr. Shadel's report in the administrative record indicates that the Plan had them prior to the August 15, 2011, suspension of benefits.  Even if they are considered new evidence, they also would be difficult to refute.

22

reason for the denial of benefits." Balmert, 601 F.3d at 501. Plaintiff argues that the administrative appeal was procedurally unfair because the trustees allegedly affirmed the suspension of benefits on appeal based on a new ground not relied on by the Plan, specifically, Plan §6.06(a).[4]

The August 15, 2011, decision of the Plan referred to Plan §6.06(f). AR 5. The administrator specifically noted §6.06(f)'s language that the administrator shall "notify the Fund Administrator of certain details of any employment after such benefits have commenced" and "shall suspend pension benefits upon learning of subsequent potential service of 41 Hours of Service or more for an employer within the jurisdiction of the union." AR 05. The Plan noted that plaintiff had made a statement during his disability examination that he had worked as an operating engineer after 2005; that the Plan had received documents indicating that plaintiff had worked as a dump truck driver hauling gravel in 2010; and that plaintiff had a current commercial driver's license. AR 5. The Plan concluded that plaintiff was in violation of §6.06(f).

In the February 3, 2012, decision, the trustees began by quoting from Plan §6.06(a). That section provides, "Any monthly benefit otherwise payable under this Plan shall be permanently forfeited for any month in which a Participant or former Participant is credited with 41 or more hours of service in that month in the geographic jurisdiction of the Union in a trade or craft in which the Participant was employed[.]" AR 143.

---

[4] The court notes that plaintiff himself seeks to inject §6.06(a) into this case, essentially arguing that the suspension of benefits provision in §6.06(f) is modified by the "same trade or craft" language found in §6.06(a), see Doc. 31, pp. 9-10. That argument is addressed later in this opinion.

Basically, §6.06(a) addresses the issue of whether a participant has any property rights in suspended benefits, whereas §6.06(f) addresses the procedural requirements for a suspension of benefits. However, the issue of forfeited property rights was not before the trustees, and they made no findings on that subject.

Rather, the trustees' decision reviewing the suspension of benefits by the Plan was clearly based on §6.06(f), the same provision relied upon by Orrand in the initial notification letter suspending plaintiff's benefits. The trustees' decision also quoted from the notification requirement and the suspension of benefits provision in §6.06(f). AR 143. The trustees' decision noted that the "evidence supports the Plan's presumption that you are working more than 41 hours a month as an operating engineer[,]" a reference to the presumption afforded the Plan under §6.06(f). AR 143-144. The trustees' decision also observed that the issue before the Board was "whether it was reasonable for the Plan to presume you were working more than 41 hours a month as an operating engineer." AR 144. The Plan suspended plaintiff's benefits due to evidence that plaintiff was potentially working more than 41 hours per month working as a dump truck driver. AR 5. The trustees on appeal concluded that the evidence "supports the Fund Administrator's decision to suspend your pension benefits." AR 144. This was not a case where the trustees on appeal relied on an entirely different reason for denying benefits.

B. Arbitrary and Capricious Review

1. Standard of Review

Review under the arbitrary and capricious standard is "extremely deferential." McClain v. Eaton Corp. Disability Plan,

24

740 F.3d 1059, 1064 (6th Cir. 2014). Such review "is the least demanding form of judicial review of an administrative action; it requires only an explanation based on substantial evidence that results from a deliberate and principled reasoning process." Morrison, 439 F.3d at 300; see also, Cultrona v. Nationwide Life Ins. Co., 748 F.3d 698, 704 (6th Cir. 2014)(same); McClain, 740 F.3d at 1065 ("'When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious.'")(quoting Shields v. Reader's Digest Ass'n, Inc. 331 F.3d 536, 541 (6th Cir. 2003)). Although "the standard is not without some teeth, it is not all teeth." McClain, 740 F.3d at 1064 (noting that "[a]n 'extremely deferential review,' to be true to its purpose, must actually honor an 'extreme' level of 'deference' to the administrative decision"). "The arbitrary and capricious standard requires courts to review the plan provisions and the record evidence and determine if the administrator's decision was 'rational.'" Schwalm v. Guardian Life Ins. Co. of America, 626 F.3d 299, 308 (6th Cir. 2010). In reviewing the administrator's decision, the court's review is limited to the administrative record which was before the plan administrator at the time of the benefit determination. Id. at 308.

Where the plan grants the administrator discretionary authority to construe and interpret the provisions of the plan, the administrator is entitled to "great leeway in interpreting ambiguous terms." Shelby County Health Care Corp. v. Southern Council of Indus. Workers Health and Welfare Trust Fund, 203 F.3d 926, 935 (6th Cir. 2000). The court "must accept a plan

25

administrator's rational interpretation of a plan even in the face of an equally rational interpretation offered by the participants." Morgan v. SKF USA, Inc., 385 F.3d 989, 992 (6th Cir. 2004); see also Mitzel v. Anthem Life Ins. Co., 351 Fed.App'x 74, 81 (6th Cir. 2009)("Under the arbitrary and capricious standard, courts must favor a plan administrator's interpretation over an equally reasonable contrary interpretation.")(emphasis in original, citing Morgan).

2. Notice Provision of §6.06(f)

Under §6.06(f), a participant receiving benefits "must notify the Fund Administrator of certain details of any employment after such benefits have commenced." AR 170 (emphasis supplied). Section 6.06(f) requires the fund administrator to suspend benefits "[i]f the Participant does not provide such notice[.]" Plaintiff argues that the Plan should not have suspended his benefits because he provided notice of his employment as a farm hand and dump truck driver, and therefore the suspension clause of §6.06(f) was never triggered.

Section 6.06(f) states that the details provided by the participant "shall include the name and address of the employer, work site location, date employment commenced, nature of employment, actual hours worked by month and expected monthly hours." Such a plan provision is authorized under 29 C.F.R. §2530.203-3(b)(5), entitled "Verification," which provides that "[a] plan may provide that an employee must notify the plan of any employment" and "may request from an employee access to reasonable information for the purpose of verifying such employment." 29 C.F.R. §2530.203-3(b)(5). The purpose of this regulation is to

26

permit an employer to obtain "factual information sufficient to establish that any employment does not constitute" the type of employment under 29 C.F.R. §2530.203-3(c) which would render pension benefits subject to forfeiture. §2530.203-3(b)(5).

Plaintiff provided copies of his 2010 tax returns in response to Orrand's letter of March 18, 2011. Those returns included plaintiff's name and address, along with a Schedule C for profit or loss from business which stated that plaintiff was a "FARM HAND." AR 236. The federal 2010 tax return also listed plaintiff's occupation as "DRIVER." AR 235. Even assuming that the administrator could conclude from these documents that plaintiff was self-employed in his own business as a "FARM HAND" and "DRIVER," the tax documents provide no information concerning the work site location, date employment commenced, the precise nature of the employment, actual hours worked by month, or expected monthly hours. Some additional information was provided by plaintiff's counsel in his letter of May 12, 2011, in which he stated that plaintiff was "self employed as a driver/farm hand. His duties in these positions consisted of driving a trailer with hay and driving a dump truck with gravel." AR 252. However, this additional information likewise falls short of providing all of the "details" required under §6.06(f), most critically, the actual number of hours he worked and his expected monthly hours, information which is highly relevant to the suspension of benefits clause. It is obvious from the plain language of §6.06(f) that the information provided by plaintiff to the Plan was not sufficient to satisfy the notice requirements of that section, and the Plan administrator was justified in proceeding to decide if a suspension

27

of benefits was warranted.

3. Alleged Conflict with Prior Decision

Plaintiff argues that the decision of the trustees affirming the suspension of benefits was arbitrary and capricious in light of the June 24, 2011, decision reinstating his benefits. Although the Plan's letter of April 18, 2011, stated that it was in regard to "Suspension of Pension Benefits", neither that letter nor the June 24th letter made any reference to §6.06(f). Rather, the April 18th letter stated that plaintiff was "no longer qualified to receive disability pension benefits" and that plaintiff's benefits "will cease effective May 1, 2011." AR 245. The letter of June 24, 2011, informed plaintiff that "[b]ased on current language contained in the Ohio Operating Engineers Pension Fund, Mr. Willard's pension benefits have been reinstated at this time." AR 257. This language indicates that Orrand reinstated plaintiff's benefits based upon his review of Plan terms.

The terms of the Plan support this conclusion. Although §6.06(f) gives the plan administrator the authority to suspend pension benefits on the ground that plaintiff had worked for "41 Hours of Service or more for an employer within the jurisdiction of the Union," that section does not permanently disqualify a participant from receiving benefits. Under Plan §6.06(b), "[b]enefits shall be payable again after the Participant notifies the Fund Administrator in writing as to the first calendar month in which the Participant did not engage in 41 or more hours of service." AR 169. Based on this language, Orrand may have concluded that the April 18th notice stating that plaintiff was "no longer qualified to receive disability pension benefits" and that

his benefits would "cease" overstated his authority under the Plan.

The June 24th letter contains no language suggesting that Orrand had concluded that the evidence was insufficient to support a finding that plaintiff was self-employed for 41 hours per month in his gravel business. Even if such a conclusion could be inferred from that notice, it would not conflict with the Plan's subsequent decision to suspend benefits. When the Plan suspended plaintiff's benefits in August 15, 2011, it had additional evidence before it, namely, the statements credited to plaintiff by Dr. Shadel that plaintiff was working as an operating engineer, the record of plaintiff's current commercial driver's license, and photographs of plaintiff operating heavy equipment taken in March of 2011. The record fails to demonstrate that the Plan's August 15, 2011, decision suspending benefits conflicted with the earlier reinstatement of benefits on June 24, 2011.

4. Alleged Failure to Correctly Apply §6.06(a)

Plaintiff also argues that the trustees acted arbitrarily and capriciously used the term "operating engineer" in place of the language "trade or craft" found in §6.06(a) of the Plan. Again, that section provides for the forfeiture of benefits for any month in which a participant "is credited with 41 or more hours of service in that month in the geographic jurisdiction of the Union in a trade or craft in which the Participant was employed while a Participant in the Plan." AR 169. Plaintiff essentially argues that in determining whether he had "subsequent potential service of 41 Hours of Service or more for an employer" under the benefits suspension provision of §6.06(f), the Plan and the trustees were also required to incorporate the language "trade or craft in which

29

the Participant was employed" found in §6.06(a) as an additional requirement under §6.06(f).  Advocating a narrow interpretation of the phrase "trade or craft," plaintiff further argues that since he was formerly employed in the "trade or craft" of crane operator, the finding of the Plan that he was working as an "operating engineer" was not sufficient to authorize a suspension of benefits under §6.06(f).

The court notes that the language of §6.06(f), the procedural vehicle for the Plan's decision in this case, is broader than the language of §6.06(a).  Subsection (f) makes no reference to "trade or craft."  Rather, it provides that participants receiving benefits "must notify the fund Administrator of certain details of any employment after such benefits have commenced."  AR 170, §6.06(f)(emphasis supplied).  As noted above, the Department of Labor regulations authorize plans to require the production of "factual information sufficient to establish that any employment does not constitute" a type of employment which would render pension benefits subject to forfeiture.  §2530.203-3(b)(5).  Subsection (f) further provides, "If the Participant does not provide such notice, the Fund Administrator shall suspend pension benefits pursuant to this section upon learning of subsequent potential service of 41 Hours of Service or more for an employer within the jurisdiction of the Union unless it is unreasonable under the circumstances for the Fund Administrator to presume that the Participant was engaged in such service."  AR 170 (emphasis supplied).  The term "employer" includes "any individual or corporate employer who is signatory to a contract with the Union ... and any employer not presently a party to such a contract[.]"

AR 154, Plan §1.14 (emphasis supplied).  In referring to "any employer," the Plan does not specify that this employer be any particular type of employer.  Although the trustees stated in their decision that they had information that plaintiff was working as an "operating engineer," the language of the plan is broad enough to require plaintiff to notify the Plan of his self-employment as a dump truck driver and operator of other heavy equipment such as the backhoe, regardless of whether such employment was as an operating engineer or in the "trade or craft in which the Participant was employed while a Participant in the Plan[,]" see §6.06(a), or some other type of employment.

In short, the trustees were not required to determine whether plaintiff's gravel-hauling business fell within the "trade or craft" language found in §6.06(a) in deciding whether plaintiff complied with the notice requirements of §6.06(f) or whether the Plan acted properly in suspending plaintiff's benefits under §6.06(f).  There was language in the trustees' decision, which may be regarded as dicta, which suggests how the trustees viewed that issue.  For example, Orrand noted on behalf of the trustees that plaintiff's benefits were suspended due to evidence that he was "actively working in the trade," including evidence that plaintiff listed his occupation as "driver," his commercial driver's license, and pictures of him operating a front loader.  AR 143.  Orrand also observed that while the appeal was pending, the Plan "obtained additional evidence confirming that you are actively working in Local 18's jurisdiction as an operating engineer," noting the video showing plaintiff driving a dump truck and delivering gravel.  AR 144.  Orrand further commented that plaintiff had provided no

31

evidence that he was "not working in the trade" beyond his conclusory denial that he had worked as an operating engineer since 2005 and medical records which allegedly supported his disability. AR 144.   Orrand then stated, "Your claims are contrary to the pictures and video that exist of you operating heavy equipment including a dump truck.... [W]hile you may not have worked as a crane operator after 2005, you have worked as an operating engineer." AR 144.  This language suggests that the trustees would conclude that working as an operating engineer, including operating other heavy equipment such as a dump truck and backhoe, was sufficient to constitute working in the same "trade or craft." However, the trustees were not required to decide that issue in determining whether to suspend benefits under §6.06(f).

Even assuming that a §6.06(f) suspension of benefits also requires addressing the §6.06(a) "trade or craft" issue, and even assuming that the trustees' letter actually decided that issue, their interpretation of the Plan language was not arbitrary and capricious.  As noted above, the plan administrator is entitled to "great leeway in interpreting ambiguous terms." Shelby County Health Care, 203 F.3d at 935.  Under Department of Labor regulations, suspension of pension benefits is permitted where the participant engaged in over forty hours of employment in "[a] trade or craft in which the employee was employed at any time under the plan[.]" 29 C.F.R. §2530.203-3(c)(2)(emphasis supplied).  The term "trade or craft" is defined as "a skill or skills, learned during a significant period of training or practice, which is applicable in occupations in some industry" and the determination of whether a particular job is included in a "trade or craft shall be based

upon the facts and circumstances of each case." 29 C.F.R. §2530.203-3(c)(2)(ii).

Plaintiff argues that no evidence has been submitted to support the trustees' conclusion that his work as a dump truck driver and operating a backhoe constituted working in the same "trade or craft" in which he was previously employed. However, because the Board of Trustees is composed of both employer and union representatives, it is reasonable to assume that the trustees would be familiar with what kinds of positions would constitute the "trade or craft" within their industry. In addition, the trustees did have before them Dr. Mosley's treatment records dated September 26, 2011, which reflect that plaintiff was a "former crane operator and truck operator for Kokosing." This patient background information was added to Dr. Mosley's records following a phone call from plaintiff. AR 114, 145. Therefore, even if the words "trade or craft" in §6.06(a) must be narrowly construed, as plaintiff suggests, to include only the specific work previously performed by plaintiff, the trustees had evidence before them that plaintiff was previously engaged in the "trade or craft" of truck driver prior to receiving disability pension benefits.

5. Sufficiency of Evidence

Plaintiff also argues that the evidence was insufficient to support the suspension of his benefits. Section 6.06(f) requires the administrator to suspend pension benefits "upon learning of subsequent potential service of 41 Hours of Service or more for an employer within the jurisdiction of the Union unless it is unreasonable under the circumstances for the Fund Administrator to Presume that the Participant was engaged in such service." AR 170.

This provision only demands a finding of the "potential" for 41 hours of service in a month.  The evidence before the Plan and the trustees, discussed above in the court's summary of the administrative record, was sufficient to meet this standard.

Plaintiff argues that his 2010 tax returns, which showed minimal income from sources other than his pension benefits, and the surveillance video, which only documented his activities for a few hours, fail to support the Plan's conclusion that he was working at least 41 hours in one month as an operating engineer. However, the Plan was not required to accept the income figures plaintiff reported on his tax returns as being accurate, particularly in light of the other evidence the Plan had which indicated that plaintiff had been actively operating a gravel business since at least 2010.  Further, the fact that the surveillance video, which showed plaintiff driving a dump truck and applying gravel to a driveway, encompassed only a representative sample of plaintiff's business activities, does not preclude a finding that there was a "potential" that plaintiff worked in his business at least 41 hours per month.

The court finds that the Plan and the trustees have offered "an explanation based on substantial evidence that results from a deliberate and principled reasoning process[,]" Morrison, 439 F.3d at 300, and that the Plan administrator's decision was "rational," see Schwalm, 626 F.3d at 308.

IV. Conclusion

The court concludes that the decision of the Plan administrator suspending plaintiff's benefits and the trustees' decision upholding that suspension were not arbitrary and

34

capricious.   The trustees' decision was rational and based upon substantial evidence.   Plaintiff's motion for judgment on the administrative record (Doc. 30) is denied.   Defendants' motion for judgment on the administrative record (Doc. 29) is granted.   The clerk shall enter judgment on the administrative record in favor of the Ohio Operating Engineers Pension Plan and the Ohio Operating Engineers Pension Plan Board of Trustees.


Date: September 30, 2014          s/James L. Graham
                           James L. Graham
                           United States District Judge